RECEIVED
2004 APR 22 P 3: 20
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| **JANICE PATRICK, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| **WYETH, et al.,** | ) | 3:04CV383(A) |
| | ) | |
| **Defendants.** | ) | |

## NOTICE OF REMOVAL

COMES NOW Wyeth, Inc. on its own behalf, and on behalf of its unincorporated division Wyeth Pharmaceuticals Division,[1] (collectively referred to as "Wyeth") a defendant in the above-styled cause, and gives notice that this cause is hereby removed from the Circuit Court of Macon County, Alabama to the United States District Court of the Middle District of Alabama, Eastern Division. As and for its Notice of Removal, Wyeth shows unto the Court as follows:

1. This lawsuit is a civil action within the meaning of the Acts of Congress relating to removal of cases. Plaintiffs instituted this civil action in the Circuit Court of Macon County, Alabama, on March 25, 2004 against Wyeth Pharmaceuticals Division, Wyeth, Inc. [2] formerly

---

[1] On March 11, 2002, the name of Wyeth-Ayerst Laboratories Division of American Home Products Corporation, improperly named in the Complaint as "Wyeth-Ayerst Pharmaceuticals, Inc. a Division of American Home Products Corporation," was changed to Wyeth Pharmaceuticals Division of Wyeth. Wyeth Pharmaceuticals Division is an unincorporated division of Wyeth.

[2] Wyeth is authorized to do business in Alabama as Wyeth, Inc.

01018476.1

American Home Products Corporation ("AHPC"),[3] and Joe Kelly (referred to as the "Sales Representative") said case number being CV-04-58 in said court.

2. Plaintiffs allege that they suffer from valvular heart disease as a result of their ingestion of the diet drugs, fenfluramine (Pondimin) and dexfenfluramine (Redux). Complaint at ¶¶ 1, 2, 4.

3. The summons and/or complaint were filed on March 25, 2004 and served upon defendants thereafter. Wyeth, Inc. and Wyeth Pharmaceuticals were served with the summons and complaint on March 30, 2004. Joe Kelly was served with the summons and complaint on April 6, 2004. A true and correct copy of the entire court file, with all process and pleadings served on Wyeth, is attached hereto as Appendix A. Because this Notice of Removal is filed within thirty days after service of the summons and/or complaint upon the first-served defendant, it is timely under 28 U.S.C. §1446(b).

4. This action originally could have been filed in this Court under 28 U.S.C. § 1332 because complete diversity of citizenship exists between the properly joined parties, and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

## I.
## COMPLETE DIVERSITY OF CITIZENSHIP EXISTS BETWEEN THE PROPERLY JOINED PARTIES

5. Plaintiffs are, and were at the institution of this civil action, and at all times intervening, citizens and residents of Alabama. Complaint at ¶ 1.

---

[3] On March 11, 2002, the name of AHPC was changed to Wyeth.

6. Wyeth[4] is, and was at the time of the institution of this civil action, and at all times intervening, a corporation organized and existing under and by virtue of the laws of the State of Delaware, having its principal place of business in the State of New Jersey. As a result, Wyeth is not now, and was not at the time of the filing of the Complaint, a citizen or resident of the State of Alabama within the meaning of the Acts of Congress relating to the removal of causes.

7. Plaintiffs purport to state claims against the Sales Representative, the only non-diverse defendant. According to the complaint, the Sales Representative detailed, marketed, promoted, sold and/or distributed Pondimin and/or Redux. Complaint at ¶ 22. As set forth below, there is no reasonable possibility that plaintiffs can prevail on their claims against the Sales Representative. Thus, he has been fraudulently joined, and his citizenship must be disregarded for the purposes of determining jurisdiction. *See, e.g., Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996), *rev'd on other grounds,* 204 F.2d 1069 (11th Cir. 2000).

## II.
## THE SALES REPRESENTATIVE HAS BEEN FRAUDULENTLY JOINED

### A. The Fraudulent Joinder Standard

8. In this Circuit, the fraudulent joinder standard is as follows:

> Joinder has been deemed fraudulent in [three] situations. The first is when there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant . . . . The second is when there is outright fraud in the plaintiff's pleading of jurisdictional facts . . . . In *Tapscott*, 77 F.3d at 1355 (11th Cir. 1996) (*rev'd on other grounds*), a third situation of fraudulent joinder was identified – i.e., where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant.

---

[4] As previously stated, Wyeth Pharmaceuticals Division is an unincorporated division of Wyeth. Wyeth Pharmaceuticals Division is not now, and was not at the time of the filing of the Complaint, a citizen or resident of the State of Alabama within the meaning of the Acts of Congress relating to the removal of causes.

*Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287-89 (11th Cir. 1998) (internal citations omitted) (emphasis added). While this standard is described as requiring that a defendant establish that there is no possibility that the plaintiff might prevail against a non-diverse defendant, courts reject the suggestion that "'any mere theoretical possibility of recovery under local law . . . suffices to preclude removal.'" *Travis v. Irby*, 2003 WL 1614211 at *3 (5th Cir. Mar. 28, 2003). Rather, numerous circuits have recognized that the standard is more correctly described as requiring a showing that there is *no reasonable basis* for predicating liability against the fraudulently joined defendant. *Id.* at *3. *See also In re Rezulin Prods. Liab. Litg.*, 133 F.Supp. 2d 272, 280 n.4 (explaining same); *Crowe v. Coleman*, 113 F.3d 1536, 1540 (11th Cir. 1997) (applying "arguably a reasonable basis" test) (quoting Bobby Jones Garden Apartments v. Suleski, 391 F.2d 172, 177 (5th Cir. 1968)); *BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 685 (8th Cir. 2002) (applying "reasonable basis" test); *Schwartz v. State Farm Mut. Auto. Ins. Co.*, 174 F.3d 875, 879 (7th Cir. 1999) (noting that it cannot "say that there is no possibility that a state court would someday" recognize plaintiff's liability theory, but upholding removal because that currently "is not a reasonable possibility"); *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) (applying "reasonable basis" test); *see also Woods v. Firestone Tire & Rubber Co.*, 560 F. Supp 588, 590 (S.D. Fla. 1983) (applying "arguably reasonable basis" test); *TKI, Inc. v. Nichols Research Corp.*, 191 F. Supp. 2d 1307, 1313-14 (M.D. Ala. 2002) (applying "reasonable basis" test); *Anderson v. Allstate Life Ins. Co.*, No. 00-0958, 2001 WL 228057, *8 (S.D. Fla. Feb. 1, 2001) (same); *El Chico Rest. Inc. v. Aetna Sur. & Cas. Co.*, 980 F. Supp. 1474, 1478-79 (S.D. Ga. 1997) (same).

9. In analyzing fraudulent joinder, the court must conduct a thorough inquiry into its jurisdiction. *University of South Alabama v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999)

("[O]ur removal jurisdiction is no exception to a federal court's obligation to inquire into its own jurisdiction."). The court should consider all affidavits, depositions transcripts and other evidence before it. *See Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997) (the court may consider affidavits and deposition transcripts submitted by the parties in deciding fraudulent joinder); *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir. 1989) (looking to such evidence in the context of fraudulent joinder); *Burden v. General Dynamics Corp.*, 60 F.3d 213, 217 (5th Cir. 1995) (collecting cases that authorize the court to look beyond the pleadings); *Mask v. Chrysler Corp.*, 825 F. Supp. 285, 288 (N.D. Ala. 1993) (court may look outside the pleadings). This is because, according to the Eleventh Circuit, "the proceeding . . . for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed. R. Civ. P. 56(b)." *Crowe v. Coleman*, 113 F.3d at 1538.

**B. Plaintiffs Cannot Prevail on Any of Their Claims Against the Sales Representative.**

10. Without making any distinction between Wyeth and the Sales Representative, plaintiffs assert that "Defendants" are liable for negligence (Count IV), fraud and misrepresentation (Count VI), negligent and reckless misrepresentation (Count VII), and conspiracy to defraud and fraudulently conceal (Count VIII). The crux of all of these claims is that Wyeth and its Sales Representative failed to disclose to the alleged prescribing physicians that diet drugs cause valvular heart disease ("VHD"), the injuries of which plaintiffs complain and, because of their participation in Wyeth's settlement, the only damages at issue here. Plaintiffs cannot maintain any of these claims against the Sales Representative.

11. The alleged misrepresentation at issue here is the failure of a "person", the Sales Representative, to have disclosed an association between VHD and these drugs (which was unknown

to Wyeth at the time, although that issue is assumed against Wyeth for purposes of the instant proceeding). Here, the affidavit of the Sales Representative (attached hereto as Appendix B) makes clear that he did not know of this danger! A corporation can only act through its employees, because a corporation is a legal fiction. The acts of a corporate employee are the acts of the corporation. *See, e.g. Phillips v. Amoco Oil Co.*, 614 F. Supp. 694, 703 n. 10 (N.D. Ala. 1985), *aff'd.*, 799 F.2d 1464 (11th Cir. 1986), *cert. denied*, 481 U.S. 1016 (1987) (corporation cannot conspire with its employees because the acts of the employee are the acts of the corporation).

12. Any finding to the contrary of that well-established Alabama doctrine would in effect hold a corporate employee strictly liable, even if he was unaware of the dangers of VHD and even if he did nothing more than hand to the doctor the printed materials prepared by Wyeth and approved by the Food and Drug Administration, which had found these drugs safe only shortly before the representative's visit to the prescribing physician. Alabama law requires, however, that a corporate employee personally participate in the corporate wrongdoing. *See, e.g., Devise v. Kenmore, Inc.*, Civil Action No. 03-J-943-S, Slip Op. at 7-8 (N.D. Ala. May 12, 2003) (applying Alabama law and finding that an appliance salesman had no duty of disclosure to the plaintiff for an alleged defect in the product) (Appendix C hereto); *Bowman v. Coleman Co.*, Civil Action No. 96-0448-P-C, Slip Op. at 8-11 (S.D. Ala. Sept. 3, 1996) (Magistrate Report and Recommendation) (Appendix D hereto) (declaring fraudulently joined a salesman of a heater who allegedly advised the purchaser-plaintiff that it was "a good heater" and that he "would not experience any problems with it;" court reasoned that the salesman could have no personal liability on a negligence or wantonness theory, because the salesman owed no duty to the plaintiff to prevent the heater from entering the stream of commerce and because the salesman lacked the training and expertise to perform an inspection as to the safety of the heater); *Mills v. Wex-Tex Industries*, 991 F. Supp. 1370, 1381-82 (M.D. Ala.1997) (employee

not individually liable absent allegation of personal participation in alleged tortious conduct); *see also Candy H. v. Redemption Ranch, Inc.*, 563 F.Supp. 505, 513 (M.D. Ala. 1983); (same); *Turner v. Hayes*, 719 So. 2d 1184, 1188 (Ala. Civ. App. 1997) ("corporate employees are liable personally for the wrongful action of the company or its other employees only if they personally participate in the tort"), *rev'd in part on other grounds sub nom. Ex parte Atmore Community Hosp.*, 719 So. 2d 1190 (Ala. 1998).

13. Alabama's law of innocent misrepresentation does not impose liability on one who merely transmits information, absent bad faith on the part of the messenger. For example, in *Fisher v. Comer Plantation, Inc.*, 772 So.2d 455, 463 (Ala. 2000), the Alabama Supreme Court recognized that "those who are only conduits through which faulty information is supplied by one person to a third person cannot be liable for fraud [including innocent fraud] unless they acted in bad faith." Based on this logic, the *Fisher* Court affirmed summary judgment in favor of a real estate agent, who merely passed along faulty information to a purchaser plaintiff. *Id.* at 463. *See also Speigner v. Howard*, 502 So.2d 367 (Ala. 1987) (same; real estate agent not liable for misrepresentation, including innocent fraud, merely for transmitting inaccurate information to plaintiff-purchaser, there being no evidence that agent transmitted this information in bad faith). It follows that corporate employees are not liable for fraud (including innocent misrepresentation) under Alabama law merely for passing on information about a product provided to them by their corporate employer, without any fault whatsoever on the part of the salesman.

14. To the extent that plaintiffs allege that the Sales Representative is liable for suppression for failing to disclose to the alleged prescribing physicians that diet drugs cause valvular heart disease, the injuries of which plaintiffs complain, Alabama law is clear that these local sales representatives had to have had actual knowledge of the danger of valvular heart disease and its

materiality in order to be held liable. *Hardy v. Blue Cross & Blue Shield*, 585 So.2d 39, 32 (Ala. 1991) (citing Cherokee Farms, Inc. v. Firemen's Fund Ins. Co., 526 So.2d 871 (Ala.1988); Wilson v. Brown, 496 So.2d 756 (Ala.1986); Harrell v. Dodson, 398 So.2d 272 (Ala.1981)). *See also University Federal Credit Union v. Grayson*, 2003 WL 22221231 at *5 (Ala. 2003) (same). Here the affidavit of the Sales Representative is unrefuted–he simply did not know about such dangers! Appendix B hereto at ¶ 6. As such, he had no duty to disclose the risk of valvular heart disease, about which he knew nothing.

15. Plaintiffs' allegation that the Sales Representative represented to the alleged prescribing doctors that the diet drugs were safe and effective (Complaint at ¶¶ 107, 113) is simply another way of saying that the Sales Representative did not disclose the risk of valvular heart disease, as that is the risk that plaintiffs claim rendered the drug unsafe. Thus, the essence of plaintiffs' claim is that the Sales Representative did not disclose a risk he had no duty to disclose. Moreover, the FDA determined that the drugs were safe and effective in allowing the drugs to be put on the market, and as recently as in June, 1996 for Redux. Thus, taking plaintiffs' allegations as true, the Sales Representative was only repeating what had to be true for the drugs to be allowed to be sold. To the extent that plaintiffs' fraud claim is that the Sales Representative misrepresented that the diet drugs were safe and effective, this FDA finding cannot rise to the level of puffery, much less fraud.

16. Plaintiffs also cannot prevail on a fraud claim because they have failed to plead fraud with particularity. *Compare* Fed. R. Civ. P. 9(b) (requiring that allegations of fraud be stated with particularity), *with* Ala. R. Civ. P. 9(b), Comment (stating that the Alabama Rule is identical to the federal rule).

17. Finally, Plaintiffs' vague and conclusory allegations of a conspiracy among the defendants also fail for several reasons. First, as previously stated, Alabama law recognizes that

an employee cannot legally conspire with his employer. *Phillips v. Amoco Oil Co.*, 614 F. Supp. 694, 703 n. 10 (N.D. Ala. 1985), *aff'd.*, 799 F.2d 1464 (11th Cir. 1986), *cert. denied*, 481 U.S. 1016 (1987). In addition, under both Federal and Alabama procedure, "all averments of fraud" must be pleaded "with particularity." Fed. R. Civ. P. 9(b); Ala. R. Civ. P. 9(b). This requirement applies to claims of conspiracy to commit fraud just as it applies to any other averment of fraud. *See, e.g., Friedlander v. Nims*, 755 F.2d 810, 812 (11th Cir. 1985) (applying Rule 9(b) standard to claim including allegation of "conspiracy" to defraud); *Franklin County School Bd. v. Lake Asbestos of Quebec, Ltd.*, 1986 WL 69060, *7 (N.D. Ala. Feb. 13, 1986) (applying Rule 9(b) to Alabama-law tort claims for conspiracy to defraud).[5] Moreover, where, as here, all of the underlying claims fail, the conspiracy claim also fails. *Drill Parts & Serv. Co. v. Joy Mfg.*, 619 So.2d 1280, 1290 (Ala. 1993) (conspiracy is not an independent cause of action and therefore, "when alleging conspiracy, a plaintiff must have a viable underlying cause of action."); *Allied Supply Co. v. Brown*, 585 So.2d 33, 36 (Ala. 1991) ("If the underlying cause of action is not viable, the conspiracy claims must also fail."); *Betts v. McDonald's Corp.*, 567 So.2d 1252 (Ala. 1990) (an "actionable wrong" must exist to support a conspiracy claim).

## III.
## THE AMOUNT-IN-CONTROVERSY REQUIREMENT IS SATISFIED HERE.

18. Among other claims, plaintiffs assert claims for negligence and fraud under Alabama law. Plaintiffs claim that they suffer from injury to their hearts. Compl. ¶ 4. Although

---

[5]*See also Colonial Bank of Ala. v. Ridley & Schweigert*, 551 So. 2d 390, 396 (Ala. 1989) (applying Alabama Rule 9(b) "fraud claims" that included fraudulent conspiracy); *Steiner v. Parsons*, 103 Ala. 215, 13 So. 771, 774-75 (1893) (treating allegation of conspiracy to defraud as subject to rule that fraud must be pleaded with particularity); *cf. Carlson v. Armstrong World Indus., Inc.*, 693 F. Supp. 1073, 1078 (S.D. Fla. 1987) ("in order to state a cause of action for civil conspiracy, plaintiff must state claims for relief for fraud. . . . It is necessary to plead fraudulent conspiracy with sufficient particularity to inform the multiple defendants of the facts forming the basis of the conspiracy")

the complaint does not specify a monetary demand, plaintiffs seek compensatory damages, mental anguish, past and future medical expenses and impairment, past and future loss of earnings. *See* Complaint at ¶ 127. Accordingly, the amount in controversy exceeds $75,000.00, exclusive of interests and costs. *See, e.g, Tapscott*, 77 F.3d at 1359 (11th Cir. 1996) (when plaintiffs make an unspecified claim for damages, removing party need only show by a preponderance of the evidence that amount in controversy exceeds jurisdictional limit). Cases in Alabama similar to plaintiffs' case have resulted in verdicts and settlements exceeding $75,000. *See* Appendix E hereto.

## IV.
## THE OTHER PREREQUISITES FOR REMOVAL HAVE BEEN SATISFIED.

19. As set forth above, this Notice of Removal is filed within thirty days of the service of the petition or process upon the first-served defendant.

20. All properly joined and served defendants consent to and join in this Notice of Removal. Fraudulently joined parties, such as the Sales Representative, need not join in a Notice of Removal. *See Sideritis v. State of Indiana*, 830 F.Supp. 1156, 1159, 1160 (N.D. Ind. 1993); *Moore v. Interstate Fire Ins. Co.*, 717 F.Supp. 1193, 1995 (S.D. Miss. 1989).

21. Defendants have sought no similar relief.

22. The prerequisites for removal under 28 U.S.C. § 1441 have been met.

23. **If any question arises as to the propriety of the removal of these actions, Wyeth requests the opportunity to present a brief and oral argument in support of their position that this case is removable, and to conduct jurisdictional discovery.**

WHEREFORE, Wyeth, desiring to remove this case to the United States District Court for the Middle District of Alabama, Eastern Division, being the district and division of said Court

for the County in which said actions are pending, pray that the filing of this Notice of Removal with the Clerk of the Circuit Court of Macon County, Alabama shall effect the removal of said suit to this Court.

MAIBETH J. PORTER (POR003)
KATHARINE A. WEBER (WEB026)
MARCIE E. PADUDA (PAD011)
MITESH SHAH (SHA066)

Attorneys for Defendant Wyeth and Wyeth Pharmaceuticals Division

OF COUNSEL:

MAYNARD, COOPER & GALE
1901 Sixth Avenue North, Suite 2400
Birmingham, Alabama 35203-2602
Telephone Number: (205) 254-1000

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to counsel or parties listed below by hand-delivery on this 22 day of April , 2004.

Mr. W. Lewis Garrison
Mr. J. Callen Sparrow
Mr. William Bross
Garrison, Scott, Gamble & Rosenthal
2224 First Avenue North
P.O. Box 11310
Birmingham, AL 35202

______________________________
OF COUNSEL



01018476.1

IN THE CIRCUIT COURT OF MACON COUNTY, ALABAMA

JANICE PATRICK, EDWARD PATRICK, MARGARET BROEKHOVEN, DIANE CHANDLER, TERESA CHESTNUT, CARRON FINNEY, GINGER FULLER, ANITA HIGGINS, BETH YARBROUGH, CHARLES KIRBY, JAN MONCUS, IVA SANDERS, RHONDA TAYLOR, SANDRA VINSON, REGINA YARBROUGH, CAROLE GISLER, MARY JONES, TERENCE JONES, JULIA KIZZIAH, ANNETTE LINDSEY, WANDA BRUSHWOOD, CAROL COPE, MONICA CRUMP, CAROLYN DAVIS, LINDA DRIVER, LINDA DRUMMOND, DEBBIE HAYWOOD, ADA INGRAM, LISA JOHNSON, GLENDA MORGAN, JEAN MORGAN, EUVERNA MOSS, ANGELA O'NEAL, MARY PEACOCK, SHARON PEER, LINDA PITTS, JUDY RAY, MELINDA SAGER, DIANE SELLER, PATRICIA SMITH, TERESA MARSHALL, and JANET JACKSON,

Plaintiffs,

vs.

WYETH, INC., f/k/a AMERICAN HOME PRODUCTS CORPORATION; WYETH PHARMACEUTICALS, INC f/k/a WYETH-AYERST PHARMACEUTICALS, INC., a Division of American Home Products Corporation, JOE KELLY, a citizen of the State of Alabama, and JOHN DOE NOS. 1 - 5,

Defendants.

CIVIL ACTION NUMBER CV-04-58

FILED IN CIRCUIT CLERKS OFFICE MACON COUNTY, AL
2004 MAR 25 A 9:23
EDDIE D. MALL...
CIRCUIT CLE...

## COMPLAINT

COME NOW the Plaintiffs, **JANICE PATRICK, EDWARD PATRICK, MARGARET BROEKHOVEN, DIANE CHANDLER, TERESA CHESTNUT, CARRON FINNEY, GINGER FULLER, ANITA HIGGINS, BETH YARBROUGH, CHARLES KIRBY, JAN MONCUS, IVA**

**SANDERS, RHONDA TAYLOR, SANDRA VINSON, REGINA YARBROUGH, CAROLE GISLER, MARY JONES, TERENCE JONES, JULIA KIZZIAH, ANNETTE LINDSEY, WANDA BRUSHWOOD, CAROL COPE, MONICA CRUMP, CAROLYN DAVIS, LINDA DRIVER, LINDA DRUMMOND, DEBBIE HAYWOOD, ADA INGRAM, LISA JOHNSON, GLENDA MORGAN, JEAN MORGAN, EUVERNA MOSS, ANGELA O'NEAL, MARY PEACOCK, SHARON PEER, LINDA PITTS, JUDY RAY, MELINDA SAGER, DIANE SELLER, PATRICIA SMITH, TERESA MARSHALL** and **JANET JACKSON** set forth their Complaint against Defendants as follows:

**INTRODUCTION**

1. Plaintiffs **JANICE PATRICK** and **PATRICK EDWARD** are citizens and residents of the State of Alabama, Macon County. Plaintiffs **MARGARET BROEKHOVEN, DIANE CHANDLER, TERESA CHESTNUT, CARRON FINNEY, GINGER FULLER, ANITA HIGGINS, BETH YARBROUGH, CHARLES KIRBY, JAN MONCUS, IVA SANDERS, RHONDA TAYLOR, SANDRA VINSON, REGINA YARBROUGH, CAROLE GISLER, MARY JONES, TERENCE JONES, JULIA KIZZIAH, ANNETTE LINDSEY, WANDA BRUSHWOOD, CAROL COPE, MONICA CRUMP, CAROLYN DAVIS, LINDA DRIVER, LINDA DRUMMOND, DEBBIE HAYWOOD, ADA INGRAM, LISA JOHNSON, GLENDA MORGAN, JEAN MORGAN, EUVERNA MOSS, ANGELA O'NEAL, MARY PEACOCK, SHARON PEER, LINDA PITTS, JUDY RAY, MELINDA SAGER, DIANE SELLER, PATRICIA SMITH, TERESA MARSHALL** and **JANET JACKSON** are residents and citizens of the State of Alabama. All Plaintiffs are suffering from heart valve damage and/or valvular regurgitation as a result of their ingestion, consumption and use of fenfluramine (Pondimin®), and dexfenfluramine (Redux™).

2. Each Plaintiff, by virtue of certain defined damage to his/her heart incurred as a result of his/her ingestion, consumption and use of fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine, is properly

classified as a Brown class member (Brown v. American Home Products, et al., U.S.D.C. E.D.Pa. Civil Action File No. 99-20593) holding a claim which may be properly opted out of the Nationwide Class Action Settlement Agreement With American Home Products Corporation (hereinafter National Settlement) under the terms and conditions of PTO 1415 entered in MDL Proceeding 1203, pending in the United States District Court for the Eastern District of Pennsylvania.

3. The injuries that are the subject of this Complaint were first diagnosed by echocardiograms performed subsequent to September 30, 1999.

4. Each Plaintiff suffers from injury to his/her aortic and/or mitral valve that has been established as being FDA Positive or greater by a board certified cardiologist.

5. Each Plaintiff timely and properly filed an Intermediate or Back-End opt-out form with the Claims Administrator in compliance with the terms and conditions of the National Settlement.

6. By virtue of filing the Intermediate or Back-End opt-opt, each Plaintiff is entitled to pursue the present action against the "AHP/WYETH Defendants" as defined herein below.

7. This action has been brought by each Plaintiff for the purpose of recovering damages for the personal injuries and damages each Plaintiff sustained as the result of her ingestion, consumption and use of fenfluramine (Pondimin®), and dexfenfluramine (Redux™), alone or in combination with phentermine. Defendants are liable to each Plaintiff for their individual and collective acts, omissions, and involvement in developing, testing, evaluating, securing government approval for, manufacturing, distributing, advertising, conspiring to promote, monitoring and/or selling said drug compounds despite Defendants knowledge of the unreasonable risk of death and bodily injury associated with the use of said drugs which was knowingly and purposely concealed by Defendants from each Plaintiff, the Plaintiffs' Doctors, and others.

8. Each Plaintiff seeks to recover only those damages permitted under the terms and conditions of the National Settlement in relation to the "AHP/WYETH Defendants".

9. Each Plaintiff seeks to recover all damages permitted under law against all other Defendants in this action (i.e. all Defendants other than the "AHP/WYETH Defendants").

10. The injuries sustained by each Plaintiff were the result of the acts and omissions of Defendants committed both inside and outside the State of Alabama.

11. As a direct and proximate result of the "AHP/WYETH Defendants" purposeful concealment of the dangers associated with the use of fenfluramine and dexfenfluramine, each Plaintiff has only recently discovered and learned that she was injured and damaged by Defendants' misconduct. Each Plaintiff was prevented from discovering, and could not have discovered, his/her injuries and damages earlier because of Defendants fraudulent misrepresentations, conspiracy and concealment of facts and information relating to the subject drugs as more specifically alleged below. In fact, Plaintiffs did not learn that they suffered valvular heart disease caused by the use of diet drugs until they had echocardiograms performed subsequent to September 30, 1999.

12. The Honorable Louis Bechtle, formerly of the District Court for the Eastern District of Pennsylvania made the following findings in his Order approving the Nationwide Class Action Settlement with American Home Products in MDL Proceeding 1203 (In Re: Diet Drugs):

> "The instant class has a great deal of cohesion in that the class was basically exposed to one substance, manufactured by one defendant over a relatively short period of time and suffers or is at risk of suffering one particular type of injury." (PTO 1415 at p. 46)

> "Each class member's claims allege a common defect in the diet drugs and a common course of conduct by AHP with regard to developing and marketing those diet drugs." (PTO 1415 at p. 43)
>
> "The court finds that common issues that pre-existed this settlement - - involving a common product, defendant, and course of conduct - - when considered in light of the proposed settlement, predominate over any individual issues between class members." (PTO 1415 at p. 43)
>
> "Although there are some individual differences among class members, the common class-wide focus of AHP's knowledge and conduct predominate such that judicial efficiency will be improved through the class mechanism as opposed to relitigating the same issues in a series of individual cases...the class here involves a single defendant with essentially a single diet drug product." (PTO 1415 at p. 42)

See Pretrial Order 1415 (MDL Proceeding 1203), 2000 WL 1222042 (E.D. Pa. August 8, 2000).

13. The nationwide Class Action Settlement Agreement referenced above also includes the following language with respect to intermediate and back-end opt out claims:

> "With respect to each Class Member who timely and properly exercises the intermediate opt-out (or back-end opt-out) right and who initiates a lawsuit against any of the Released Parties within one year from the date on which the intermediate opt-out (or back-end opt-out) right is exercised, the AHP Released Parties shall not assert any defense based on any statute of

> limitations or repose, the doctrine of laches, any other defense predicated on the failure to timely pursue the claim [and] any defense based on 'splitting' a cause of action . . ."

See Nationwide Settlement Agreement § IVD3(C) and IVD4(C).

Under the Nationwide Class Action Settlement Agreement, sales rep defendants are included within the definition of Released Parties. See Nationwide Settlement Agreement § I-48.

## Defendants

14. Defendant, WYETH, INC. (formerly known as AMERICAN HOME PRODUCTS CORPORATION) (hereinafter "AHP/WYETH" or " AHP/WYETH Defendant" or "Manufacturer Defendant"), has its principal place of business at 5 Giralda Farms, Madison, New Jersey. AHP/WYETH is incorporated under the laws of the State of Delaware. At all times relevant hereto, AHP/WYETH (itself and as a successor to Lederle and A. H. Robins Company) was and has been in the business of promoting, marketing, distributing, manufacturing and/or selling the pharmaceutical drugs fenfluramine and/or dexfenfluramine. At all times relevant to this action, AHP/WYETH developed, manufactured, promoted, marketed, distributed and/or sold the aforementioned drugs through interstate commerce and in the State of Alabama, and otherwise did business in Alabama related to this cause.

15. On March 11, 2002 AMERICAN HOME PRODUCTS CORPORATION changed its name to "WYETH" or "WYETH, INC."

16. Defendant AHP/WYETH may be served with a copy of summons and complaint at AHP/Wyeth, c/o CSC Lawyers Incorporating Service, 57 Adams Avenue, Montgomery, AL 36104.

17. Defendant AHP/WYETH is subject to the jurisdiction and venue of this court.

18. Defendant, WYETH PHARMACEUTICALS, INC., a division of Wyeth, Inc. (formerly known as Wyeth-Ayerst Pharmaceuticals, Inc.) (hereinafter "WYETH PHARMACEUTICALS" or

"AHP/WYETH Defendant" or "Manufacturer Defendant"), has its principal place of business at 555 Lancaster Avenue, St. Davids, Pennsylvania, 19087. To the extent that WYETH PHARMACEUTICALS does not maintain its principal place of business at said address, it maintains its principal place of business at 500 Arcola Road, Collegeville, Pennsylvania, 19426. WYETH PHARMACEUTICALS is incorporated under the laws of the State of Delaware. At all times relevant hereto, WYETH PHARMACEUTICALS was in the business of promoting, marketing, distributing, manufacturing and/or selling the pharmaceutical drugs fenfluramine and /or dexfenfluramine. At all times relevant to this action WYETH PHARMACEUTICALS developed, manufactured, promoted, marketed, distributed and/or sold the aforementioned drugs through interstate commerce and in the State of Alabama, and otherwise did business in Alabama related to this cause.

19. On March 11, 2002 WYETH-AYERST PHARMACEUTICALS, INC. changed its name to "WYETH PHARMACUETICALS".

20. Defendant WYETH PHARMACEUTICALS may be served with a copy of summons and complaint at its principal place of business, 555 Lancaster Avenue, St. Davids, Pennsylvania, 19087.

21. Defendant WYETH PHARMACEUTICALS is subject to the jurisdiction and venue of this court.

22. Defendant JOE KELLY (hereinafter "Sales Rep Defendant") is a resident of the State of Alabama. Upon information and belief, and at all times material hereto, this Sales Rep Defendant was individually employed, contracted, associated or otherwise engaged as a pharmaceutical sales person, detailer and/or pharmaceutical representative by AHP/WYETH in furtherance of marketing, promoting, selling and/or distributing the pharmaceutical drugs fenfluramine (Pondimin®) and/or dexfenfluramine (Redux™) in the State of Alabama. As set forth more completely herein, the Sales Rep Defendant committed positive tortuous acts against each Plaintiff. Specifically, within the years of

1996 and 1997, and prior to that time, the following named Sales Rep Defendant was directly involved in detailing, marketing, promoting, selling and/or distributing of drugs fenfluramine (Pondimin®) and/or dexfenfluramine (Redux™), alone or in combination with phentermine to the following named Plaintiff's prescribing physicians:

a. Sales Rep Defendant Joe Kelly detailed, marketed, promoted, sold and/or distributed fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine to Plaintiffs **MARGARET BROEKHOVEN, CAROLE GISLER AND CAROL COPE** prescribing physician, John Sabatine, M.D.

23. Upon information and belief the positive tortuous acts which were committed by the Sales Rep Defendant in his individual and/or corporate capacity, include, but are not limited to, the following:

a. Sales Rep Defendant failed to convey adequate warnings to the Plaintiffs through the prescribing physician set forth above regarding the risks of prescribing fenfluramine (Pondimin®) and dexfenfluramine (Redux™);

b. Sales Rep Defendant was in the business of marketing, promoting, selling and/or distributing the unreasonably dangerous pharmaceutical drug fenfluramine (Pondimin®) and dexfenfluramine (Redux™) which has caused harm to the Plaintiffs;

c. Sales Rep Defendant negligently distributed, marketed, advertised and/or promoted the drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux™);

d. Sales Rep Defendant made fraudulent and reckless misrepresentations regarding the character, safety and efficacy of the drug fenfluramine (Pondimin®) and dexfenfluramine (Redux™), and;

e. Sales Rep Defendant, with knowledge of unreasonable risks associated with the ingestion of fenfluramine (Pondimin®), dexfenfluramine (Redux™), alone and/or in combination with phentermine continued to make misrepresentations regarding the character, safety and efficacy of drug fenfluramine (Pondimin®) and dexfenfluramine (Redux™), while providing and/or offering incentives, rebates, reimbursements, perks, and/or other consideration to each Plaintiff's prescribing physician in furtherance of attempting to influence the prescribing of said diet drugs.

24. Defendant Joe Kelly is a citizen of Houston County and is over nineteen years of age. At all times material hereto, this Defendant was in the business of promoting, marketing, developing, selling and/or distributing the pharmaceutical drugs fenfluramine and/or dexfenfluramine in the State of Alabama and did market, develop, sell, detail and/or distribute said drugs to each Plaintiff's prescribing physician. This Defendant was also involved in a conspiracy to conceal certain information relating to the dangers associated with the subject drug products from the consuming public, including but not limited to each Plaintiff.

25. Defendant Joe Kelly may be served with a copy of summons and complaint at 734 Woodland Drive, Dothan, Alabama, 36301.

26. Defendant Joe Kelly is subject to the jurisdiction and venue of this court.

27. JOHN DOE NOS. 1-5 are five separate persons, firms and/or corporations, who are believed to be citizens of the State of Alabama whose identities are otherwise unknown at this time. At all times material hereto, said Defendants were in the business of promoting, marketing, developing, selling and/or distributing the pharmaceutical drugs fenfluramine and dexfenfluramine. The John Doe Defendants were also involved in a

conspiracy to conceal certain information relating to the dangers associated with the subject drug products from the consuming public, including but not limited to, the Plaintiffs.

28. Once the identities and whereabouts of each John Doe Defendant is established, said Defendants will be served with a copy of summons and complaint as provided by law.

29. The John Doe Defendants are subject to the jurisdiction and venue of this court.

## General Allegations

30. The drugs, fenfluramine (Pondimin®) and dexfenfluramine (Redux™) were widely sold, distributed, promoted and advertised by the named Defendants, and various fictitious party Defendants, as effective weight control products. Defendants sold and distributed the subject drugs in Alabama as well as other states and placed said drugs into the stream of commerce knowing that they would enter the state in which Plaintiffs resided and be consumed therein.

31. Fenfluramine was one of the drugs prescribed in combination and promoted and referred to as "fen/phen". The AHP/WYETH Defendants marketed fenfluramine under the trade name, Pondimin®. In doing so, the AHP/WYETH Defendants actively encouraged, and/or failed to effectively discourage, the combined use of fenfluramine because they knew that the combined use would increase sales of fenfluramine.

32. The named Defendants, as well as the fictitious party Defendants, directly or indirectly, made, created, manufactured, assembled, designed, sterilized, tested, evaluated, labeled, supplied, packaged, marketed, advertised, warranted, distributed and/or sold the drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux™). These same Defendants assisted in, and had control over, the design, assembly, packaging, labeling, marketing, advertising, manufacturing distribution and sale of the drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux™).

33. At all times material hereto, all Defendants, including the fictitious party Defendants, either knew or should have known that the drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux™) had been related to and associated with severe and life threatening complications.

34. In 1965, the diet drug Aminorex was introduced in Europe. Aminorex was touted as a wonder weight loss drug that worked by increasing brain serotonin and inhibiting reuptake of serotonin. However, by 1967 evidence began to surface that the ingestion of Aminorex was associated with pulmonary hypertension. Over the next six years, an Aminorex epidemic raged in Europe. There was a ten-fold increase in primary pulmonary hypertension cases. Half of the patients died within ten years and the rest of the patients suffered significant oxygen deprivation and are debilitated for the remainder of their lives. Aminorex was removed from the European market in 1972. The AHP/WYETH Defendants knew, or should have known, of the European experience with Aminorex and how it would relate to AHP/WYETH's drugs Pondimin® and Redux™ three (3) decades later.

35. In 1973, Pondimin was introduced into the United States market. Pondimin® is a fenfluramine drug and is in the same family of drugs as Aminorex, and is very similar to Aminorex. Pondimin® was touted as a wonder weight loss drug that worked by increasing brain serotonin and inhibiting reuptake of serotonin. However, because the drug when used alone made users lethargic and tired, sales of Pondimin languished.

36. In the year 1990, the Food and Drug Administration (FDA) approved fenfluramine for use as a weight reduction drug for the short-term medical management of obesity. Since that time, fenfluramine has been increasingly prescribed and used in combination with the drug phentermine to maximize weight loss. This combination is commonly known as "fen-phen".

37. The AHP/WYETH Defendants actively encouraged, and/or failed to effectively discourage, the combined use of fenfluramine and phentermine because they knew that the combined use would increase sales of fenfluramine.

38. The "phen" portion of "fen-phen" consists of phentermine, an amphetamine which helps the body burn calories faster and which serves to counteract the drowsiness caused by the "fen" portion of the dosage consisting of fenfluramine, a drug which affected the serotonin levels in the brain. Despite the fact that the concomitant use of fenfluramine and phentermine was never approved by the FDA, the subject drugs were widely prescribed for use in combination with each other and/or with dexfenfluramine in place of fenfluramine, as promoters of weight loss.

39. Dexfenfluramine is the d-isomer of fenfluramine, containing essentially the same active ingredient as fenfluramine. The AHP/WYETH Defendants marketed dexfenfluramine under the trade name Redux™.

40. The AHP/WYETH Defendants have known the serious side effects of fenfluramine and/or dexfenfluramine for a substantial period of time. These side effects were known or should have been known to all Defendants at the time that they marketed the drugs to the public based on, among other things, medical evidence of dangerous and potentially fatal side effects from the use of the drugs in Europe and elsewhere, as detailed below. Defendants did not, however, conduct adequate testing to establish the safety of the drugs before marketing them. Rather, the Defendants aggressively marketed the drugs and promoted their use, both individually and in combination with other drugs, while downplaying evidence of the serious and potentially fatal side effects that consumers of these drugs could face.

41. Defendants undertook a marketing strategy which included advertising and promotional campaigns to aggressively promote and sell the subject drugs by falsely misleading potential users about the products, by suppressing material facts, and by failing

to warn users about the serious health effects which Defendants knew or should have known could result from the use of the subject drugs.

42. This advertising campaign on the whole, through its affirmative misrepresentations and omissions, falsely and fraudulently sought to create the impression and to convey to Plaintiffs and others on whom each Plaintiff would rely, that the use of either fenfluramine or dexfenfluramine alone or in combination with phentermine as "fen-phen" was safe and had fewer adverse health and side effects than was actually known to Defendants at the time they made these representations.

43. Fenfluramine and dexfenfluramine were aggressively marketed by Defendants, often by encouraging unapproved off-label combination use of the products.

44. Defendants, as manufacturers and distributors, or agents thereof, knew of and recklessly encouraged the prevalence of off-label combination use of their drugs and failed to warn physicians and consumers that the combination drug regimen was not FDA approved, was not recommended and had not been systematically tested by appropriate clinical trials or follow-up reporting of adverse effects.

45. Defendants undertook a promotional campaign that included the placement of numerous articles in scientific, medical and general interest magazines extolling the virtues of fenfluramine combined with phentermine in order to induce widespread use of the product. Many of these articles either cited or reported the results of studies that were funded by the AHP/WYETH Defendants. Thus, the AHP/WYETH Defendants actively encouraged, or failed to effectively discourage, combinations of these drugs.

46. Defendants actively encouraged, or failed to effectively discourage, combinations of these drugs by employing and/or contracting with commission based salespersons to promote the widespread prescribing of fenfluramine and/or the combination of fenfluramine and phentermine to patients that were not clinically obese.

47. The marketing program as a whole, by affirmative misrepresentations and omissions, falsely and fraudulently sought to create the image and impression that the use of fenfluramine, both individually and/or in combination with phentermine, was safe for human use, had fewer side effects and adverse reactions than other methods of weight loss, constituted a convenient, safe form of weight loss and would not interfere with daily life.

48. Defendants purposefully downplayed and understated the health hazards and risks associated with fenfluramine and/or dexfenfluramine.

49. Defendants falsely and fraudulently concealed relevant information from doctors and potential fenfluramine and/or dexfenfluramine users regarding the safety of fenfluramine and/or dexfenfluramine.

50. In particular, the AHP/WYETH Defendants' marketing efforts as well as their product inserts, falsely, fraudulently and negligently misrepresented a number of facts regarding fenfluramine and/or dexfenfluramine, including the following:

a. The presence of adequate testing of fenfluramine and the presence of adequate testing of any combination use of the product with phentermine;

b. Fenfluramine and/or dexfenfluramine's efficacy including but not limited to the severity, frequency and discomfort of side effects and adverse health effects caused by the drugs; and

c. The relative risks associated with the drugs including the prevalence of pulmonary hypertension and primary pulmonary hypertension.

51. On October 3, 1981, Dr. J.G. Douglas published *Pulmonary Hypertension and Fenfluramine* in the British Medical Journal. On January 25, 1986 an article entitled *Irreversible Pulmonary Hypertension after Treatment with Fenfluramine*, was published in the British Medical Journal. The AHP/WYETH Defendants knew, or should have known, of the British Medical Journal articles and how those articles related to their drug Pondimin® a decade later.

52. In 1984, Dr. Michael Weintraub published *A Double-Blind Clinical Trial in Weight Control: Use of Fenfluramine and Phentermine Alone and in Combination* in the Archives of Internal Medicine. Dr. Weintraub's study was supported by A.H. Robins (which was later acquired by AHP/WYETH). Despite noting some adverse effects associated with fenfluramine, Dr. Weintraub entirely failed to examine the long-term safety of fenfluramine. Instead, the study focused on the short-term effectiveness of the drugs used individually, and in combination.

53. In 1992, Dr. Weintraub published a series of articles in Clinical Pharmacological Therapies, in which he reported his research regarding the long term use of fenfluramine and phentermine for weight control. Dr. Weintraub's research was supported by the AHP/WYETH Defendants.

54. Dr. Weintraub's research assumed the safety of fenfluramine, and did not examine the short-term or long-term safety of the drug. Further, the AHP/WYETH Defendants failed to conduct or fund any studies or research regarding the long-term safety of the fenfluramine drug, Pondimin. Nevertheless, the AHP/WYETH Defendants did promote to physicians and the public Dr. Weintraub's conclusion that long term combination use of fenfluramine and phentermine was effective for the management of obesity.

55. By 1993, the AHP/WYETH Defendants labeling for Pondimin® indicated that there were only 4 reported cases of pulmonary hypertension reported in association with the drug. Yet, that same year, Dr. Francois Brenot published *Primary Pulmonary Hypertension and Fenfluramine Use*, in the British Heart Journal. Dr. Brenot identified 25 cases of primary pulmonary hypertension associated with the use of fenfluramine and/or dexfenfluramine. The AHP/WYETH Defendants knew or should have known of the Brenot article. AHP/WYETH should have known by at least 1993 that Pondimin® was defective

and unreasonably dangerous. AHP/WYETH should have known by at least 1993 that AHP/WYETH's labeling of Pondimin® was false.

56. On June 24, 1994, AHP/WYETH Safety Surveillance Monitor, Amy Myers, wrote a memo to AHP Medical Monitor, Fred Wilson, and indicated that AHP/WYETH's database contained 37 cases of primary pulmonary hypertension associated with Pondimin®. Further, in February 1994, the preliminary results of the International Primary Pulmonary Hypertension study ("IPPH Study") entitled "Appetite Suppressants and the Risk of Primary Pulmonary Hypertension" was released and available to the AHP/WYETH Defendants. The preliminary results of the IPPH Study confirmed the association between fenfluramine and dexfenfluramine, and pulmonary hypertension and primary pulmonary hypertension. The AHP/WYETH Defendants concealed the number of cases of primary pulmonary hypertension associated with Pondimin® that the AHP/WYETH Defendants knew existed in order to continue to market Pondimin® for profit.

57. In June 15, 1995 AHP/WYETH Defendants' James Ottinger, reported to Joseph Bathish the status of the European Committee on Proprietary Medicinal Product's ("CPMP") pharmacovigilance discussion wherein the CPMP working party concluded that a causal relationship between anorectic agents, like fenfluramine and/or dexfenfluramine, and the occurrence of primary pulmonary hypertension had been established.

58. The August 26, 1996 issue of the New England Journal of Medicine reported the final results of IPPH Study, which had been preliminarily released in February 1994. The IPPH Study concluded that fenfluramine-based anorexigens, such as fenfluramine and dexfenfluramine, increased the risk of PPH by a multiple of more than <u>23 times</u>.

59. The AHP/WYETH Defendants were aware of the result of the IPPH study by at least February 1994. Nevertheless, the AHP/WYETH Defendants failed to apprise the public or physicians that the risk of contracting PH or PPH was many, many multiples of that previously reported by the AHP in their literature. Even after the Brenot article and the

preliminary release of the IPPH Study the AHP/WYETH Defendants failed to remove Pondimin® from the market when the AHP/WYETH Defendants knew of the extreme danger, causal relationship and substantial risk of harm associated with the use AHP's drug Pondimin.

60. Even prior to their knowledge of the IPPH Study, the manufacturers and distributors of the subject drugs knew about the risks of PPH associated with using the subject drugs from experience with and subsequent banning of such drugs in various countries in Europe. Nevertheless, Defendants failed to apprise each Plaintiff, the public at large, or physicians of these material facts and risks.

61. The AHP/WYETH Defendants continued to promote Pondimin after learning of the extreme danger associated with it. The AHP/WYETH Defendants continued to promote Pondimin knowing the drug had no beneficial use. The AHP/WYETH Defendants labeling on the drug was totally inadequate to alert prescribing physicians and patients of the actual PH or PPH danger and risk associated with its fenfluramine drug, Pondimin. The AHP/WYETH Defendants knew that danger and that risk.

62. Even after they knew of the danger the AHP/WYETH Defendants did not remove Pondimin from the market and did not do any further testing of the drug. Instead, the AHP/WYETH Defendants continued to market the drug to prescribing physicians like the physicians that prescribed the diet drugs to each Plaintiff in this case.

63. Further, in 1996 the AHP/WYETH Defendants introduced their dexfenfluramine drug, Redux™ into the U.S. market despite the fact that the AHP/WYETH Defendants knew of the danger and risks of primary pulmonary hypertension associated with Pondimin®.

64. The AHP/WYETH Defendants did not adequately or appropriately disclose fenfluramine and/or dexfenfluramine information or related drug information to physicians in the United States. Instead the AHP/WYETH Defendants fraudulently concealed the

pulmonary hypertension (PH) or primary pulmonary hypertension (PPH) danger they knew of from physicians. As a result, physicians have over-prescribed fenfluramine and/or dexfenfluramine drugs, Pondimin® and Redux™, to patients who were grossly under-informed regarding the risk of PH or PPH associated with the drugs.

65. Although the FDA approved phentermine and fenfluramine separately, the FDA never approved the drugs for combined use. The AHP/WYETH Defendants knew of and encouraged the prevalence of off-label combined use of their drugs, and failed to adequately and appropriately warn physicians and consumers that the combination drug regimen was not FDA approved, was hazardous due to the presence of fenfluramine, was not recommended and had not been systematically tested by appropriate clinical trials. Further, the AHP/WYETH Defendants fraudulently concealed, destroyed and removed written evidence and/or intentionally misrepresented evidence supporting the association between PH and/or PPH with fenfluramine and/or dexfenfluramine.

66. The AHP/WYETH Defendants failed to fully and adequately warn doctors, the public and/or the Plaintiffs about the risk of pulmonary hypertension and primary pulmonary hypertension from Pondimin® and Redux™.

67. At all times relevant to this cause, Defendants also knew or should have known of many other studies, regulatory actions and concerns, incidences of injury and/or death, concerns about the subject drugs, safety among scientists, researchers, regulators and other knowledgeable professionals, the dangers of drug combinations, meetings among pharmaceutical industry officers, executives or employees (including Defendants), internal memos and reports of health concerns regarding the subject drugs, the desire of Defendants to stop or delay regulatory action regarding the subject drugs, the lack of sufficient safety studies before and during marketing of the subject drugs, the contents of Defendants' own files, plans and reports, the danger of the off-label use of medications, the desire of Defendants to maximize profits despite safety concerns, safety concerns

about the drugs which could block or change FDA approval, regulatory actions, reports of injury and concerns about the subject drugs in Europe, case reports of pulmonary hypertension, regulatory efforts to make changes in the warning and labels required on these products and the plans and actions of Defendants to fight such changes (including supplying regulators with false or misleading information), warning labels on the products designed so that they would be overlooked by physicians and users such as the Plaintiffs, statements by medical professionals regarding safety concerns for the subject drugs, the fact that phentermine is an MOAI drug which would be contra-indicated for usage with fenfluramine and dexfenfluramine, prevalent usage of unsafe combinations of the subject drugs (as promoted by Defendants) and adverse effects reported therefrom, the failure of Defendants to report incidences of PPH resulting from the use of the subject drugs to regulators and health care professionals, false information provided by sales representatives and others concerned with advertising and promoting the subject drugs, efforts to derail regulatory review and oversight of the subject drugs, the identification of groups most at risk of injury, the misrepresentation and concealment of reports regarding adverse health effect of the subject drugs by Defendants from regulators and health care professionals, and many other material facts regarding the subject drugs and which would have shown the danger and adverse health effect of using the subject drugs. Nevertheless, Defendants did suppress, misrepresent and failed to inform Plaintiffs, the public at large, or physicians of these material facts and risks, and did encourage and promote unsafe usage by Plaintiffs and others.

68. Defendants, having undertaken the manufacture, sale, marketing, distribution and promotion of the diet drugs described herein owed a duty to provide Plaintiffs, physicians, state regulators and others upon whom it was known, or should have known, by Defendants that Plaintiffs would rely, accurate and complete information regarding the subject drug products. Nevertheless, Defendants misrepresented these facts, and failed

to inform and did conceal from Plaintiffs, the public at large, and physicians of the material facts and risks of using the subject drugs.

69. Defendants fraudulently represented to Plaintiffs, Plaintiffs' physicians, state regulators and others upon whom it was known, or should have been known that each Plaintiff would rely, that the subject drugs were safe and effective, that the benefits of taking the subject drugs outweighed any risks and misrepresented and concealed safety and effectiveness information regarding its products including but not limited to the propensity to cause serious physical harm when used alone and in combination. The continuous and ongoing course of action constituting fraud and misrepresentation upon Plaintiffs started as early as 1993, if not earlier, and continued through repeated acts and non-disclosure every year since then, in the State in which each Plaintiff resides, throughout the United States, and elsewhere.

70. Defendants' fraudulent misrepresentations took the form of, among other forms, express and implied statements, publicly disseminated misinformation, misinformation provided to state regulatory agencies, inadequate, incomplete and misleading warnings about the subject products, failure to disclose important safety and injury information regarding the products while having a duty to disclose to Plaintiffs and others such information, and elaborate marketing, promotional, and advertising activities designed to conceal and mislead regarding the safety of the subject products.

71. The subject drug products were in fact unsafe, and the use of the subject drug products posed a risk of injury and death that outweighed the purported benefits of their use, such that injury was in fact caused to Plaintiffs and others.

72. Defendants failed to adequately warn Plaintiffs and those whom they knew Plaintiffs would rely of the hazards associated with the use of the subject diet drug products and conspired to conceal and did conceal this knowledge from the Plaintiffs and others.

As a result of this failure to warn, each Plaintiff was caused to suffer the injuries and damages hereinafter set forth.

73. Each Plaintiff was prescribed and/or ingested the drugs fenfluramine (Pondimin®) and/or dexfenfluramine (Redux™) for weight loss and suffered injury thereby.

74. Although Defendants knew or should have known that dangerous risks were associated with the use of fenfluramine (Pondimin®) and dexfenfluramine (Redux™), Defendants proceeded to or permitted the same to be advertised, promoted, distributed and sold without adequate warnings of the serious side effects and dangerous risks. Defendants knew of and encouraged the prevalence of off-label combination use of their drugs and failed to warn physicians and consumers that the combination drug regimen was not FDA approved, was not recommended and had not been tested by appropriate clinical trials.

75. The drugs fenfluramine and dexfenfluramine were defective and unreasonably dangerous when they left the possession of Defendants in that, among other ways:

a. the subject drugs caused injury to the user far beyond any warned, noticed, expected or reasonable side effect or adverse reaction and when placed in the stream of commerce they contained unreasonably dangerous defects subjecting Plaintiffs to risks from expected or known usage, including bodily injury and death, which exceeded the benefits of the subject drugs;

b. when placed in the stream of commerce the subject drugs were defective in design and formulation, making use of the drugs more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with obesity and weight loss;

c. the subject drugs contained insufficient and/or ineffective warnings to alert consumers and users to the risks of valvular heart disease;

i. the subject drugs were insufficiently tested (singularly or in combination);

ii. there were insufficient instructions on the proper use of the subject drugs;

iii. there was misleading advertising and promotion concerning the safety and benefits of using the subject drugs;

iv. there were inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the significant risks previously described, Defendants failed to provide adequate warnings to users and consumers, and/or their physicians, and continued to promote the sale and use of the subject drugs; and

v. the subject drugs had not been materially altered or modified prior to the use of said drugs by Plaintiffs.

d. Defendants were in the business of distributing and selling the products made the basis of this lawsuit. Defendants sold and/or distributed these products in a defective condition that was unreasonably dangerous to the user or ultimate consumer of this product. Each product was expected to and did reach the user and consumer Plaintiffs without substantial change in the condition at which it was sold.

76. As a direct and legal result of the defective condition of the drugs fenfluramine (Pondimin®) and dexfenfluramine (Redux™), each Plaintiff has sustained and will continue to sustain serious and permanent injuries, physical pain and suffering,

impairment, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors, physically suffering, undergoing medical monitoring, and undergoing heart valve surgery; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems associated with her injuries.

77. Certain John Doe Defendants each reside and work in the State of Alabama. Said Defendants worked for or on behalf of the Manufacturing and Distributing Defendants herein in the State of Alabama, and elsewhere throughout the United States, at times relevant to this cause, and each actively and personally participated in the marketing, distribution, promotion and advertising in each state that the subject diet drugs were ultimately used by Plaintiffs, resulting in injury to Plaintiffs.

78. The tortuous actions and misdeeds of Defendants as alleged herein are ongoing and at all times relevant hereto were ongoing and continuous and constituted ongoing and continuous torts.

**COUNT I (STRICT LIABILITY - DEFECTIVE PRODUCT)**

79. Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

80. The allegations set forth under Count I apply only to the Manufacturer Defendants, AHP/WYETH, as identified hereinabove.

81. The fenfluramine (Pondimin®) and dexfenfluramine (Redux™) drugs which were designed, developed, researched, manufactured, and/or supplied by the Manufacturer Defendants were not merchantable nor reasonably suited to their intended use due to design defects in the subject drugs.

82. The risk of severe and life threatening complications and other side effects associated with use of the subject diet drugs constituted dangers and risks which were inherent in the design of the drugs that served to outweigh any utility the drugs may have had.

83. The Manufacturer Defendants, individually and collectively, knew, or should have known, that fenfluramine (Pondimin®) and dexfenfluramine (Redux™) were, and are, dangerously defective products that posed an unacceptable risk unknown to, and unknowable by, the consuming public.

84. Each Plaintiff has suffered injury and has incurred damages as a direct and proximate result of the design defects existing in regard to fenfluramine (Pondimin®) and dexfenfluramine (Redux™), causing Defendants to be liable to Plaintiffs under the doctrine of strict liability due to the defective nature of the subject drug products.

**COUNT II (STRICT LIABILITY - FAILURE TO WARN)**

85. Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

86. The allegations set forth under Count II apply only to the Manufacturer Defendants, AHP/WYETH, as identified hereinabove.

87. At the time the Manufacturer Defendants placed fenfluramine (Pondimin®) and dexfenfluramine (Redux™) into the stream of commerce for sale or consumption by Plaintiffs, said Manufacturer Defendants failed to accompany said inherently dangerous products with sufficient warnings to advise doctors or consumers of the health risks associated with the subject drugs.

88. To the extent that any warning was provided by the Manufacturer Defendants with the subject drug products, the warning was defective as it did not accurately reflect the true dangers associated with the defective drug products and did not accurately serve to warn physicians or consumers of:

a. the true risks of injury associated with the products;

b. the symptoms of such injuries;

c. the scope of such injuries; or

d. the severity of the known risks associated with these products.

89. As a direct and proximate result of the Manufacturer Defendants' failure to provide adequate warnings with the subject drug products, each Plaintiff has suffered injury and damages for which she is entitled to recover.

**COUNT III (STRICT LIABILITY - FAILURE TO TEST)**

90. Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

91. The allegations set forth under Count III apply only to the Manufacturer Defendants as identified hereinabove.

92. The Manufacturer Defendants failed to perform adequate testing of the subject drug products prior to placing said products in the stream of commerce, in that adequate testing would have shown that fenfluramine (Pondimin®) and dexfenfluramine (Redux™) each posed a substantial and serious risk of harm to consumers of the drugs which were not accurately disclosed.

93. As a direct and proximate result of the Manufacturer Defendants' breach of their duty to adequately test the subject drug products, each Plaintiff has suffered injury and damages for which she is entitled to recover.

**COUNT IV (NEGLIGENCE)**

94. Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

95. At all times material hereto, each Defendant owed a duty to Plaintiffs to exercise reasonable care in the design, manufacture, testing, processing, advertising,

marketing, promotion, labeling, assembling, packaging, distributing and selling of the subject diet drug products.

96. Defendants, individually and collectively, were negligent in their actions, misrepresentations, and omissions toward Plaintiffs.

97. Defendants were negligent in their design, manufacture, processing, testing, advertising, marketing, promotion, labeling, assembling, packaging, distributing and/or selling the subject drugs which they knew were unreasonably dangerous and carried with them significant side effects. Such negligent acts include, but are not limited to the following:

a. Defendants acted negligently in designing, manufacturing, processing, advertising, marketing, promotion, testing, labeling, assembling, packaging, distributing and/or selling the drugs which they knew, or through the exercise of reasonable diligence should have known, were dangerous or unreasonably dangerous and carried with them significant side effects;

b. Defendants acted negligently in failing to include adequate warnings with the drugs that would alert consumers and physicians to the potential risks and serious side effects of the drugs;

c. Defendants acted negligently in failing to adequately and properly test the drugs before placing the drugs on the market;

d. Defendants acted negligently in failing to conduct sufficient testing on the drugs that, if properly performed, would have shown that the drugs had serious side effects;

e. Defendants acted negligently in failing to warn Plaintiffs that use of the drugs carried a risk that heart transplant and lung transplant might become necessary to repair damages caused by the drugs; and

f. Defendants acted negligently in failing to provide post-marketing warnings or instructions after Defendants knew or should have known of the significant risks of pulmonary and/or cardiovascular injury from the use of the drugs.

98. Defendants knew or should have known that the drugs caused unreasonably dangerous risks and serious side effects of which Plaintiffs would not be aware. Defendants nevertheless manufactured, packaged, advertised, marketed, promoted, sold and distributed the subject diet drug products in a negligent manner knowing that there were safer methods and products for weight loss and/or weight control.

99. As a direct and proximate result of the negligence of Defendants, each Plaintiff has sustained, and will continue to sustain in the future, serious and permanent injuries; physical pain and suffering; impairment; disability; disfigurement; heart valve surgery; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings; loss of the ability to earn money in the past and the future; expense of hospitalization; medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems associated with their injuries, and as otherwise set forth under this Complaint.

**COUNT V (BREACH OF WARRANTIES)**

100. Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

101. When the Manufacturer Defendants and the John Doe Defendants placed the subject drugs into the stream of commerce, they knew of the use for which the drugs were intended (as diet aids and weight loss medications), and expressly and impliedly warranted the products to be of merchantable quality and to be safe and fit for such use.

102. Plaintiffs reasonably relied upon the expertise, skill, judgment and knowledge of the Manufacturer Defendants and the John Doe Defendants and upon the express and/or implied warranty that the drugs were of merchantable quality and fit for use for weight loss and/or weight control.

103. The drugs were not of merchantable quality and were not safe or fit for their intended use because the products were, and are, unreasonably dangerous and unfit for the ordinary purposes for which they were used, in that they caused injury to Plaintiffs and others far beyond any acceptable or warned side effect. Said drug products were unduly dangerous in expected use and did cause undue injury to Plaintiffs.

104. As a direct and proximate result of the Manufacturer Defendants' and the John Doe Defendants' breach of both implied and expressed warranties, each Plaintiff has suffered injuries and sustained damages.

105. As a direct and proximate result of the breach of warranty by the Manufacturer Defendants and the John Doe Defendants, each Plaintiff has sustained and will continue to sustain serious and permanent injuries; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; heart valve surgery; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with his/her injuries; and as otherwise set forth under this Complaint.

**COUNT VI (FRAUD AND MISREPRESENTATION)**

106. Plaintiffs adopt and re-allege each paragraph above as if fully set forth herein.

107. All Defendants, including the John Doe Defendants, knew or should have known that the material representations they were making regarding the safety and efficacy of the subject diet drug products were false, and made such misrepresentations with the intent or purpose that Plaintiffs, Plaintiffs' physicians, state medical boards, state pharmacy boards, state regulators, and others would rely upon them, leading to the ingestion and use of the subject drugs by Plaintiffs.

108. At the time of Defendants' fraudulent misrepresentations and omissions, each Plaintiff was unaware of the falsity of the statements being made, reasonably believed such statements to be true, and acted in reasonable reliance upon such statements.

109. Defendants breached their duty to disclose to Plaintiffs by willfully and recklessly providing false, incomplete, and misleading information regarding the subject drug products, and Defendants acted with deliberate intent to deceive and mislead Plaintiffs; and those who Defendants knew or should have known the Plaintiffs would rely upon in ingesting and using of the subject diet drugs.

110. Plaintiffs reasonably relied upon these inaccurate and fraudulent misrepresentations, and relied upon the absence of adverse safety information about the drugs which Defendants did suppress, conceal, or fail to disclose, and suffered damage and injury as a result thereof.

111. As a direct and proximate result of Defendants' fraudulent misrepresentations, made with the intent to deceive Plaintiffs and others, each Plaintiff has suffered injury and damages; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; heart valve surgery; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense

of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with their injuries; and as otherwise set forth under this Complaint.

**COUNT VII (NEGLIGENT AND RECKLESS MISREPRESENTATION)**

112. Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

113. Defendants negligently and recklessly represented to Plaintiffs, Plaintiffs' physicians, state medical boards, state pharmacy boards, state regulators and other persons and professionals on whom it was known by Defendants that Plaintiffs would rely, as well as the public at large, that the subject diet drug products were safe to ingest and that the utility of these products outweighed any risk in use for the intended purpose of weight loss and/or weight control. Also, by negligently failing to disclose to Plaintiffs, and others for the benefit of Plaintiffs, important safety and injury information, thereby suppressing material facts about the drugs, while having a duty to disclose such information, which duty arose from their actions of making, marketing, lobbying in support of, promoting, distributing and selling pharmaceutical products to Plaintiffs and others, Defendants further led Plaintiffs to rely upon the safety of the product in its use.

114. The false representations of Defendants were negligently and recklessly made, in that the subject drug products in fact caused injury, were unsafe, and the benefits of their use were far outweighed by the risk associated with use thereof. Defendants, individually and collectively, committed acts of negligent misrepresentation and negligent concealment by suppressing material facts relating to the dangers and injuries associated with, and caused by, the use of the subject drugs.

115. Defendants knew or should have known that their representations were false. Defendants made such false, negligent and/or reckless representations with the intent or

purpose that Plaintiffs and Plaintiffs' physicians would rely upon such representations, leading to the use of the subject drugs by Plaintiffs.

116. As a direct and proximate result of Defendants' negligent and reckless misrepresentations or concealment of facts, upon which Plaintiffs reasonably relied, each Plaintiff has suffered injury and sustained damages for which Defendants are liable.

117. In undertaking to disseminate the negligent and reckless misrepresentations set forth above, Defendants intended to cause the deregulation, removal of restrictions on sale, and otherwise make the subject diet drug products readily available to Plaintiffs and the general public for purchase and/or use of the subject drug products solely to facilitate economic gain by Defendants. As a direct result of the negligent and reckless misrepresentation of Defendants, each Plaintiff has sustained and will continue to sustain serious and permanent injuries; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with their injuries; and as otherwise set forth under this Complaint.

**COUNT VIII (Conspiracy to Defraud and Fraudulently Conceal)**

118. Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

119. All Defendants, as well as the John Doe Defendants, entered into a conspiracy to suppress and fraudulently misrepresent material information that they were under a duty to disclose to Plaintiffs. In undertaking such conspiracy, Defendants purposely

failed to properly inform consumers, including Plaintiffs, of the health risks associated with these products as known by Defendants. Defendants entered this conspiracy that included those acts previously described concerning various studies and reports which were not disclosed to the consuming public, and the other specific allegations regarding fraud and misrepresentation made hereinabove.

120. Defendants conspired together to commit the tort of fraud and misrepresentation upon Plaintiffs, in the same manner as contained in the allegations of fraud, concealment and misrepresentation stated above, knowing that same would lead to increased sales of said products and personal gain to each Defendant with a proportionate increased incidence and risk of injury and death to Plaintiffs.

121. Each Defendant herein participated in combination in the conspiracy to defraud, conceal and misrepresent, which conspiracy had an unlawful, oppressive, and immoral purpose (to increase profits by increasing incidences and risks of death and injury) and/or achieved its purpose by unlawful, oppressive and immoral means (the suppression and fraudulent misrepresentation of material facts regarding important safety and health information which Defendants had a duty to disclose and disseminate under applicable state and federal law) and did commit overt acts in furtherance of the conspiracy, which was a legal cause of actual injury and damage to Plaintiffs.

122. As a result of the conspiracy, Defendants made fraudulent misrepresentations to Plaintiffs and others as set forth above, and important safety and injury information was concealed from and misrepresented to Plaintiffs, and others upon whom Plaintiffs relied, with the intent that Plaintiffs would rely upon the misrepresentations and absence of concealed information, as more specifically set forth above.

123. As a result of the conspiracy, each Plaintiff relied upon the misrepresentations of fact as specifically stated above, and did rely upon the absence of important safety and injury information, and as a result was injured and suffered serious

and permanent injuries; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental anguish concerning future medical problems including but not limited to those associated with her injuries; and as otherwise set forth under this Complaint.

**COUNT IX (JOHN DOE DEFENDANT LIABILITY)**

124. Plaintiffs adopt and re-allege each paragraph above, as if fully set forth herein.

125. The John Doe Defendants listed in this Complaint, whose identities at this time are unknown, are also liable to Plaintiffs in strict liability, negligence, breach of expressed and implied warranty, fraud and misrepresentation, negligent and reckless misrepresentation, and conspiracy to defraud and fraudulently conceal, as well as those other actions pled in this Complaint.

126. As a direct and proximate cause of the aforementioned illegal and tortuous acts, each Plaintiff was injured and suffered damages including, but not limited to: (permanent and ongoing into the future) injury to each Plaintiff's heart and other physical injuries; physical pain and suffering; mental pain and suffering; impairment; disability; disfigurement; mental anguish; loss of capacity for the enjoyment of life past and future; time in life that could have been spent doing things other than going to doctors; physically suffering, and undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; fear and mental

anguish concerning future medical problems including but not limited to those associated with his/her injuries; and as otherwise set forth under this Complaint.

**PLAINTIFF DAMAGES**

127. As a result of the individual, combined and concurring acts and omissions of Defendants as set forth herein above, each above-named Defendant, caused or contributed to cause the following injuries to Plaintiffs:

a. Plaintiffs have been caused to suffer physical injury, past, present and future pain and suffering, disability, impairment, lost capacity to enjoy life, mental anguish, and lost earnings in an amount to be proven at trial;

b. Plaintiffs have been caused to incur medical expenses and will in the future incur medical expenses in an amount to be proven at trial;

c. Plaintiffs have been caused to undergo medical monitoring and will be required to undergo medical monitoring for the rest of their lives in an amount to be proven at trial;

d. Plaintiffs have been caused to suffer past, present and future fear and mental anguish concerning their present and future medical problems including but not limited to those associated with their injuries in an amount to be proven at trial.

e. Past and future loss of earnings and earning capacity;

f. Prejudgment and post-judgment interest;

g. Costs and attorney's fees; and

h. Plaintiffs claim only compensatory damages against the AHP/WYETH Defendants.

Respectfully submitted this 23 day of March, 2004.

W. LEWIS GARRISON (WLG008)
J. CALLEN SPARROW (SPA006)
WILLIAM L. BROSS (BRO181)

OF COUNSEL:

GARRISON, SCOTT, GAMBLE & ROSENTHAL, P.C.
2224 1st Avenue North
P. O. Box 11310
Birmingham, AL 35202
Telephone: 205-326-3336
Facsimile: 205-326-3332

**PLAINTIFFS DEMAND TRIAL BY STRUCK JURY ON ALL ISSUES RAISED HEREIN.**

Of Counsel

**Serve Defendant(s):**

Wyeth Pharmaceuticals, Inc.
555 Lancaster Avenue
St. Davids, Pennsylvania 19087

WYETH, INC. f/k/a AMERICAN HOME PRODUCTS
c/o CSC Lawyers Incorporating Service
57 Adams Avenue
Montgomery, AL 36104

Joe Kelly
734 Woodland Drive
Dothan, Alabama, 36301

**AFFIDAVIT**

Before me, a notary public in and for said County and State, personally appeared Joe H. Kelly, who being by me duly sworn, deposes on oath and says:

1. My name is Joe H. Kelly. I am over the age of twenty-one years and make this affidavit based upon my personal knowledge.

2. I worked for Wyeth, formerly known as American Home Products Corporation, as a sales representative from 1991 until 2003.

3. I never advertised, assembled, created, designed, detailed, distributed, labeled, made, manufactured, marketed, packaged, promoted, sold, sterilized, supplied, tested, or warranted Pondimin, or trained anyone to do so. I never left samples of Pondimin with any healthcare provider. I had no involvement in the development or preparation of package inserts for Pondimin, and had no control over the content of those inserts or over other written warnings related to that drug. I sometimes answered questions from doctors about Pondimin, but I never promoted that drug. Indeed, I had no reason to promote Pondimin because I received no credit or commission or bonus based on Pondimin sales.

4. I never assembled, created, designed, distributed, labeled, made, manufactured, packaged, sold, sterilized, supplied, tested, or warranted Redux, or trained anyone to do so. I never left samples of Redux with any healthcare provider. I had no involvement in the development or preparation of package inserts for Redux, and had no control over the content of those inserts or over other written warnings related to that drug.

5. As part of my duties, I detailed Redux to licensed healthcare providers.

6. I was not aware of any alleged association between Pondimin and/or Redux and valvular heart disease until the time such an allegation was first publicized. I was not aware before that time of any study, report or other literature which claimed that an association exists between Pondimin and/or Redux and valvular heart disease or that anyone had alleged such an association. I was not aware of any information in Wyeth's possession concerning such an association. Thus, I could not have warned doctors or diet drug users of any alleged association between Pondimin and/or Redux and valvular heart disease. I never intentionally misrepresented the safety, efficacy or state of testing of Pondimin or Redux alone or in combination with phentermine to any licensed healthcare provider or to any diet drug user.

7. I am not a medical doctor or pharmacist. I have no specialized medical or pharmacological education, except what I received from Wyeth. My knowledge of the drugs I detailed was derived primarily from Wyeth. Wyeth provided me with the FDA-approved package inserts and other information regarding the drugs I detailed, including Redux.

[signature]

Sworn to and subscribed before me this 12th day of April, 2004.

[signature: Laura L. Martin]
NOTARY PUBLIC
MY COMMISSION

EXPIRES: 1-26-2008